(November 22, 1911.)

# JOHN RIPPETOE, Respondent, v. CHARLES FEELY, Appellant.

### [119 Pac. 465.]

JUROR—CHALLENGE—WAIVER—NONSUIT—WAIVER—SUFFICIENCY OF EVI-
DENCE—PERSONAL INJURIES—CONTRIBUTORY NEGLIGENCE.

#### (Syllabus by the court.)

1.   Where it is charged upon appeal that the trial court erred in overruling a challenge to a juror and the record does not show that the party complaining was compelled to use one of his peremptory challenges upon the juror challenged for cause, and was thereby deprived of a peremptory challenge, it will be presumed that he was not compelled to exercise all of the peremptory challenges allowed him by law, and for that reason could not have been prejudiced by the action of the trial court in denying the challenge for cause.

2.   Where a motion is made for a nonsuit at the close of the evidence on the part of the plaintiff upon the ground that the evidence is insufficient to warrant the submission of the cause to a jury, and the motion is denied, and evidence is thereafter offered by the defendant, the ruling of the trial court upon the motion is not reviewable upon appeal from the judgment or from the order overruling the motion for a new trial.

3.   In an action to recover for personal injuries where contributory negligence is plead as a defense, the plaintiff cannot recover when it is proven by the evidence that the negligence of the plaintiff was a proximate cause of the injury, notwithstanding the fact that the evidence may also show negligence on the part of the defendant.

4.   To prevent a recovery by reason of contributory negligence, the person injured must be guilty of a want of ordinary care, and it must appear that such want of care was a proximate cause of the injury. The negligence or want of care, however, of the injured person need not be the sole proximate cause of the injury, for that would exclude all negligence on the part of the defendant, and there would be no reason for the application of the rule of contributory negligence on the part of both parties.

5.   In an action for personal injury received by the plaintiff at the hands of a defendant, if the evidence shows that the plaintiff

contributes to the injury by a want of ordinary care in placing himself in a dangerous position and where he might be injured, and does not exercise ordinary care in preventing the accident after he so placed himself in such position, then the mere fact that the defendant was negligent would not relieve the plaintiff from the effect of his contributory negligence, unless it also appears that the defendant after discovering plaintiff's dangerous position could have avoided the consequences of the plaintiff's negligence; that is, could have avoided the injury which took place by the exercise of ordinary care.

6. It is the duty of the appellate court to set aside the verdict of a jury where there is no evidence to sustain it or where it is against the law given to the jury by the court, and if the appellate court is satisfied that but one conclusion can be deduced from the evidence and that conclusion is that the negligence of the plaintiff was a proximate cause of the injury and that the injury would not have occurred had the plaintiff exercised ordinary care, then in such case a verdict for plaintiff for personal injuries must be set aside.

APPEAL from the District Court of the Eighth Judicial District for Kootenai County. Hon. R. N. Dunn, Judge.

An action for personal injuries. Judgment for the plaintiff. *Judgment reversed.*

Chas. L. Heitman, and E. N. La Veine, for Appellant.

Even if defendant was guilty of gross negligence, contributory negligence bars a recovery. (See cases cited in 37 Cent. Dig., Neglig., sec. 85 (a) ; *Neal v. Gillett,* 23 Conn. 437.)

A man cannot place himself in a position of known danger (as did plaintiff in the case at bar), and recover for an injury resulting therefrom. (*Chicago & A. R. Co. v. Murphy,* 17 Ill. App. 444; *Robinson v. Manhattan Ry. Co.,* 5 Misc. 209, 25 N. Y. Supp. 91; *Brown v. Milwaukee St. Ry. Co.,* 22 Minn. 165.)

"Inasmuch as it was apparent from the evidence of the plaintiff that he could, by the exercise of ordinary care, have avoided, not only the injury, but the consequences to himself of the negligence of the defendant, even if such negligence was shown, he was not entitled to recover." (*Barber v. East*

*& West R. Co.,* 11 Ga. 838, 36 S. E. 50; *Perry v. Railroad Co.,* 101 Ga. 400, 29 S. E. 304; *Mansfield v. Richardson,* 118 Ga. 250, 45 S. E. 269; *Chicago & N. W. Ry. Co. v. Weeks,* 99 Ill. App. 518; judgment affirmed, *Weeks v. Chicago & N. W. Ry. Co.,* 198 Ill. 551, 64 N. E. 1039; *Bowling Green Stone Co. v. Capshaw,* 23 Ky. Law Rep. 945, 64 S. W. 507; *Illinois Steel Co. v. McNulty,* 105 Ill. App. 594; *Silcock v. Rio Grande W. Ry. Co.,* 22 Utah, 179, 61 Pac. 565; *Cummings v. Helena & L. Smelting & Reduction Co.,* 26 Mont. 434, 68 Pac. 852; *Wright v. Southern Ry. Co.* (N. C.), 71 S. E. 306; *Murphy v. Chicago etc. R. R. Co.,* 45 Iowa, 661; *Wilds v. Hudson River R. Co.,* 24 N. Y. 430; *Kresanowski v. Northern Pac. R. Co.,* 18 Fed. 229, 5 McCrary, 528; *So. Pac. Co. .v. Pool,* 160 U. S. 438, 16 Sup. Ct. 338, 40 L. ed. 485; *Bier v. Hosford,* 35 Wash. 544, 77 Pac. 867.)

Where there are two methods by which a service may be performed, one perilous and the other safe, an employee who voluntarily chooses the perilous rather than the safe one cannot recover for an injury thereby sustained. (*Hoffman v. Am. Foundry Co.,* 18 Wash. 287, 51 Pac. 385; *Stratton v. Nichols Lumber Co.,* 39 Wash. 323, 109 Am. St. 881, 81 Pac. 831; *Jenkins v. Maginnis Cotton Mills,* 51 La. Ann. 1011, 25 So. 643.)

A verdict which law does not authorize upon the evidence, because not justified therefrom, is contrary to law. (*Kelley v. Morris,* 6 Pet. (U. S.) 523, 8 L. ed. 622; *Bosseker v. Cramer,* 18 Ind. 44; *Holyman v. Kanawha & M. R. Co.,* 65 W. Va. 264, 64 S. E. 536, 22 L. R. A., N. S., 741, 17 Ann. Cas. 1149; *Sweeney v. C. P. R. R. Co.,* 57 Cal. 15.)

Thomas Mullen, for Respondent.

Where the evidence is such that different minds may reasonably draw different conclusions as to contributory negligence, the question is for the jury. (29 Cyc. 631 et seq., and cases cited.)

This rule will not be affected by the fact that plaintiff was the only witness in his behalf. (*Scholl v. Broadway R. Co.,*

137 N. Y. 566, 33 N. E. 339, affirming 63 Hun, 629, 17 N. Y. Supp. 755.)

STEWART, C. J.—This is an action to recover damages for personal injuries. The complaint alleges that at the time of the happening of the injury, the defendant was the owner and engaged in the operation of a steam-threshing outfit; that on the 26th day of August, 1910, and for some time prior thereto, the plaintiff was employed by the defendant, and during said employment and immediately prior to receiving the injuries in the performance of his duty, he was engaged in moving certain bundles of grain lying under the wheels of the separator, and which was necessary to be removed in order to allow said separator to be hauled away and forward by said traction engine; and that while plaintiff was so engaged the defendant was in charge of the operation of the engine, and without giving plaintiff any warning of his intention so to do, started up said engine attached to said separator suddenly and violently, knowing at the time, or could have known with the exercise of reasonable care, that the plaintiff was in a dangerous position and liable to be injured, but regardless thereof the defendant suddenly hauled and propelled said separator over and across and upon the person of the plaintiff and caused the tongue of said separator to be dropped upon the plaintiff and the plaintiff to be run over by the separator and thereby injured, and thereby damaged the plaintiff in the sum of $15,000. The complaint further alleges that $300 was paid out on account of the injuries and for surgical and medical attendance and medicine. The answer of the defendant puts in issue the allegations of the complaint, admits the plaintiff's employment by the defendant, and alleges that the plaintiff was an expert machinist, and that it was the plaintiff's duty, among other things, to set, care for, level, plumb, and put in place the separator, and to direct and supervise the other help and assistants among the threshing crew, whose duty was to assist and help in connection with and about the separator and to give the engineer all needed and necessary signals to go either forward or backward or for any purpose

whatever; that on the 26th day of August, 1910, the plaintiff
being in charge of the separator and supervisor of the help,
and while engaged in and about the setting of the separator
and putting it in readiness and in position to thresh certain
grain, and the defendant being in charge of the engine, the
plaintiff signaled the defendant to back the engine in the di-
rection of the separator for the purpose of detaching the
separator; that the defendant moved the engine as directed
in the direction of the separator and immediately received
a signal from the plaintiff to move forward said engine, and
directed the defendant to go ahead; that the defendant there-
upon moved the engine forward, and the plaintiff having
failed to detach or cause the separator to be detached from
the engine, as it was his duty, the separator was moved for-
ward; and upon information and belief alleges that suddenly
after giving defendant the signal to move forward and advis-
ing him to go ahead, the plaintiff carelessly and negligently
stepped directly in front of the separator and next to the
front axle and beneath the feed-box of the separator, and was
in a stooping position and reached into the tool-box; that the
defendant had no knowledge that the engine was not detached
from the separator and no knowledge of the whereabouts of
the plaintiff at the time the engine and separator began to
move forward, and no knowledge that the plaintiff had placed
himself in front of the separator; that if the plaintiff had
detached the separator or caused the same to be detached from
the engine, as it was his duty to do, the injuries would not
have occurred, and that the failure of the plaintiff to perform
his duty and to exercise due and reasonable and ordinary care
was the proximate cause of the injuries received by the plain-
tiff.

Upon the issues thus formed, the cause was tried to a jury
and a verdict was returned in favor of the plaintiff and
against the defendant for the sum of $3,000. This verdict
was signed by nine jurors, and upon their verdict the court
rendered judgment in accordance therewith. A motion was
made for a new trial and overruled, and this appeal is from

the judgment and from the order overruling the motion for a new trial.

The first question presented on appeal is the ruling of the trial judge in denying a challenge made as to the qualification of one O. D. Burns, who was called as a juror, and examined upon his *voir dire.* The record in this case does not show how many jurors were called and examined in said cause nor how many were excused for cause and how many peremptorily, and it does not appear from the record that the plaintiff was required or did exhaust all of his peremptory challenges. Neither does it appear that the Juror Burns was excused, or if excused by whom. So far as the record is concerned, he may have remained on the jury and may have been one of the three who did not sign the verdict for the plaintiff, but that does not appear, and without it appearing in the record that the party complaining was compelled to use one of his peremptory challenges upon the juror challenged for cause, and thereby was deprived of a peremptory challenge, it will be presumed he was not required to exercise all the peremptory challenges allowed him by the statute; for these reasons he was not prejudiced by the action of the trial court in denying a challenge for cause. (*Knollin v. Jones,* 7 Ida. 466, 63 Pac. 638.) For these reasons we are not called upon to examine the evidence upon the examination of O. D. Burns or to determine whether he was disqualified.

It is next urged that the trial court erred in overruling the motion of appellant for a nonsuit after the close of plaintiff's testimony. This motion for a nonsuit was based upon a number of grounds, the principal one of which is that the plaintiff was guilty of contributory negligence, which was the proximate cause of the injury received by him and for which damages are sought in this action. In determining this question, this court is not required to examine the testimony offered by the plaintiff, for the reason that it is the rule of this court that where a motion is made for a nonsuit upon the ground that the evidence offered by the plaintiff is insufficient to prove the plaintiff's cause of action, and does not warrant the submission of the case to a jury, and the motion is denied

and evidence is thereafter offered by the defendant, the ruling of the trial court upon the motion is not reviewable upon appeal from the judgment or order overruling a motion for a new trial.

In the case of *Shields v. Johnson,* 12 Ida. 329, 85 Pac. 972, this court, in passing upon this question, said:

"Without going into the question whether the motion was properly made in this case, it is sufficient to say that defendant waived it by putting in his testimony. A defendant has an undoubted right to stand upon his motion for a nonsuit, and have his writ of error, if it be refused; but he has no right to insist upon his exception after having subsequently put in his testimony and made his case upon the merits, since the court and jury have the right to consider the whole case as made by the testimony."

This rule of law was approved in the later case of *Barrow v. B. R. Lewis Lumber Co.,* 14 Ida. 698, 95 Pac. 682.

Upon these authorities the trial court did not err in overruling the motion for a nonsuit.

The next question and the principal ground urged upon this appeal is, that the evidence clearly shows contributory negligence on the part of the respondent at the time the alleged injury occurred.

It appears in this case that the plaintiff was engaged prior to August 26, 1910, in operating and managing and controlling a separator used by the defendant in thrashing grain in Kootenai county, Idaho; that at such time the defendant had charge of the engine which drew the separator from place to place and operated the separator when threshing; that the plaintiff had been engaged in and in charge of the operations of a separator for some thirty years, and for twenty-three or twenty-four years had performed this character of labor during the threshing season in Kootenai and adjoining counties; that the defendant had owned this threshing outfit for three years, and during the first two years of such ownership had had some experience in operating the engine, and during the year of the accident had had charge of the operation of the engine during most of the threshing

season up to the time the accident occurred; that in the afternoon of August 26, 1910, the threshing outfit was taken on the Post place, where the injury occurred. It appears that the separator was drawn up between the stacks by a chain about 23 ft. long, fastened to the water-tank. This chain was double and ran from the tongue up to the water-tank and was put through a clevis in the shape of a ''D'' at the rear of the tank and then ran back and hooked into the end of the tongue of the separator; that this hook at the end of the chain which hooked into the end of the tongue of the separator was of such a size that it would pass through the ''D'' clevis on the rear of the tank without catching the hook on the clevis; the water-tank was hitched on to the engine; that when the separator was drawn up between the stacks the wheel caught against some of the bundles in one of the stacks and tore them out and they were in the way of the separator, and the separator was stopped to remove them.

In describing the accident the plaintiff testified substantially as follows:

''When we got in the stacks the space was not wide enough and the wheels hit the stacks and knocked a lot of bundles out. There was quite a lot there pulling out the bundles and throwing them out of the way so we could go on with the traction engine and we got into the stacks, I suppose, four and a half feet or so; I signaled him to stop and gave him the signal to unhook—to back up and unhook and go ahead. He did so. I held up my hand for a signal. When he got where I wanted to stop I held my hand up and that was a signal for him to unhook. He backed up and unhooked; I gave him the signal.

''Q. What kind of a signal did you give him? A. When I held my hand up; when he got where I wanted to stop, I held my hand up and that was the signal for him to unhook. He backed up and unhooked and I gave him the signal to go ahead, but just at that time he stopped the machine and he hollowed back to me, 'John are we going to catch the four stacks?'—there was four stacks—'going to catch the four stacks at one setting?' I says, 'I will see, Charlie,' and

I looked around a little and saw we could pull up a little further and I says, 'We will pull up a foot and a half or two feet further and we can catch them all at this setting.' And Mitchell—he was the fellow that uncoupled—he says, 'You will have to back up and uncouple.' I says, 'No; no need of that. Unhook your chain,' I says, 'You can pull it on with the chain.' I stepped back to the separator. I was up in front of the feed and I stepped back and Mitchell and Gordon were standing there, talking, their backs to me, and I says, 'You fellows ready there so we can go ahead?' They turned around and I stepped back to this separator to those bundles and took my foot and kicked the bundles under the tongue,— kicked them from ahead of the wheel so that the wheel would not run over them. They were right in front of the wheel. When I did that it started and it started with a jerk and the traction slipped and caused the tongue to jerk down. The tongue dropped and caught me and I hollowed as loud as I could and kept hollowing, and the wheel struck me on this arm and ran up on to this shoulder and up on my face and I kept hollowing until it got up on my ear and it dragged me along through the sand ten or fifteen feet—I don't know— I guess—

"Q. Did you give him the customary hand signal? A. No, sir; I didn't; but if he had tooted his whistle I could have got out of the way—started slow. . . . . When the separator man gives the signal to go ahead they are supposed to give him two toots. . . . . Indicating they are going to start.

"Q. Anything of that kind done? A. No, sir. This particular outfit has a custom to give two toots when it is at a stop, one when you stop and two when you want to go ahead. If you give me a signal and I don't answer you back, you would not know whether I got the signal or not.

"Q. You say there were no signals of that kind given at this time when they started. A. No, sir.

"Q. But I believe you said you had a talk with him that you had to move a couple of feet further? A. One and a half or two feet further."

Defendant could not see under the separator tongue on account of the water wagon piled up as it was with bedding; plaintiff testified ''the first signal I gave after they pulled in there was to unhook and move ahead; Mitchell was doing the unhooking; he was working for the defendant; defendant did not have anything to do with the unhooking of the chain—he was running the engine; I gave the signal to Mitchell to unhook the chain and he unhooked it; after unhooking, the engine was stopped—backed up and stopped and defendant hollowed and asked if I was going to catch all four stacks at that setting,—that is, the question amounted to that, and I says, 'I will see shortly, Charlie,' and I stepped back and I says, 'You can go ahead a foot and a half or two feet further,''and Mitchell spoke up and says, 'We will,' or something like that. I says, 'No need of that at all,' I says, 'Hook on to the chain and move it ahead that way'; that is where the chain was hooked when they stopped it. They used the single length of the chain when they started up. The last time they had the full length of it. When the engine started up it was too near the engine—when the engine started up the last time the water wagon was about fifteen feet from the end of the tongue. When I told them to back up, I was standing right there by the feed—in front of the feed. I wasn't then sitting down. I told them to hitch the chain on to the water-tank so they could move up and after I told them to go ahead, I sat down to kick out the bundles. I told him we could move up a foot and a half or two feet further, and I went to kick those bundles out of the way. I was standing up in front of the feed when I told them to move up a foot and a half. I said we can move up that far, then I sat down and kicked the bundles out of the way. I sat down on the ground. I was not ordered by Feely to keep these bundles out of the way. It was not his place to order me to keep them out of the way. It was my place to look out for that and make it easier to set the separator. If I hadn't been sitting down on the ground kicking at the bundles in front of the wheel, it would not have run over me. If I hadn't been sitting down but standing up the wheel would not have run

on to me." This witness testified that he had a conversation with the defendant a short time before the accident in which he says: "I gave Feely the signal to start up and he started up slow, and I motioned to him and he stepped away from the engine toward me and I stepped toward him and says, 'Look'y here, Charlie, you have got to use the whistle.' He says, 'I didn't come anywhere near catching you, did I?' I says, 'No, but you will catch somebody.' He says, 'Never you fear; I will never catch you. I keep my eye on you. To hell with the rest of them. Let them keep out of the way.' That is the remark."

"Q. You said you had given.him a signal to move up and unhook and they unhooked? How did you countermand the signal not to move up? A. We had a talk that he was to hook the chain again and move up with the separator.

"Q. Then you didn't give him a signal,—just talked to him? A. Just talked to him,—yes.

"Q. Where were you? A. Standing by the feed in front of the machine.

"Q. How far was that from where he was on the engine? A. I judge it was about 30 or 35 feet. . . . . I was not then sitting down kicking bundles. After I told them to move up I sat down on the ground to kick out the bundles."

E. Woodside testified on behalf of plaintiff that he was one of the gang working there and that he recollected the starting up of the separator—heard the movement of the engine; that the defendant did not give any whistle or signal of the starting of the engine; that is, he did not hear anything of the kind.

James Casey testified for the plaintiff and said that he was an experienced man in threshing outfits and that the duty of the separator-man is that he is given control of the whole outfit. The engineer works under the separator-man and the separator-man gives him an order to stop or to go ahead and he is supposed to stop or go ahead.

Walter Green, a witness for the plaintiff, testified: "I was on the engine at the time of the accident." The defendant

was running the engine; that no whistle was blown or signal given to start the engine.

Michael D. Dietrich, a witness for the defendant, testified that he had had experience in running threshing machines for fifteen or sixteen years; ·that he worked for the defendant two seasons; that during that time Mr. Rippetoe, the plaintiff, was the separator-man; that it was the custom among the Feely threshing outfit that the raising of one hand and bringing it down quick meant to stop; that it was Mr. Rippetoe's practice to give the words, "Go ahead"—that was for him to say; that it was the practice of the engineer of the outfit to give signals by sounding the whistle when they were ready to thresh and the belt was on; and when the belt was not on, it was the practice of the separator-man to give the signal to go ahead—used his hands the same way—very often—sometimes—called, "Go ahead," but the hand signal was the main signal.

"Q. What was the practice of the engineer as to sounding or not sounding the whistle at that time? A. Never sounded the whistle at such time for moving the engine."

E. Woodside was recalled on behalf of the defendant and testified that the practice of the engineer and the separator-man was that no signal was given by the engineer when the separator was moved by the engine.

W. J. Owen testified on behalf of the defendant that he was working for the defendant at the time of the accident, pitching bundles, and that the separator was pulled up between the two first stacks they came to; that Mr. Rippetoe was around between the separator and the tender and also Mr. Mitchell and a man by the name of Gordon, and Mr. Rippetoe, after he went in there, turned facing north and raised his hand and said, "Go ahead"; he was talking to Mr. Feely; Feely was on the ground and when Rippetoe hollowed, "Go ahead," then he got on to the tender on the back part of the engine there and said, "Are you all right, John?" and Mr. Rippetoe said, "Yes," and some one back there,—he could not tell who it was,—said "Yes," and Mr. Feely started the engine. Before that the chain had been unhooked. Mr.

Mitchell unhooked it. Witness stated he was about sixteen feet away from Mr. Rippetoe; that after Mr. Rippetoe gave this signal, Mr. Feely started the engine; the end of the chain, that is, the hook in the chain, caught the clevis on the tank and when Mr. Rippetoe gave this signal to Mr. Feely to go ahead, Mr. Rippetoe turned his back to witness and looked as though he was going to the feed for the level, and at that instant witness turned to see where Mr. Feely was going and just about a minute—less than half a minute later—there was a cry to stop. The practice followed in giving signals was after they were belted and ready to start threshing, to whistle two short whistles; that when the belt was not on there was no whistle blown. When the engine was started at any time the noise could be heard for 200 or 300 yards, perhaps. Generally, when the engine would start, before it would start to move, you could hear that noise for 100 yards or more. It was caused by the steam exhaust. The drive-wheel started first. That was a large wheel. This would make a noise. You could hear it without the exhaust very far—the exhaust made while it was running. No trouble in hearing this noise. When witness got to Mr. Rippetoe after the accident, he had a spirit level in his hand. When he saw him give the signal it was with the left hand, and when he was taken from under the wheel, he had the level gripped in his left hand very tight; he didn't have the level in his hand when he gave the signal; when the engine started right ahead it moved slowly.

Frank Mitchell, a witness for the defendant, testified that he was standing behind the tender just before Rippetoe was hurt; that he was waiting for him to give the signal to start the machine—waiting for him to give the signal to take the engine out of the way. This was about a minute and a half, probably, before he was hurt. The chain that connected the tender to the separator at that time was double. "Just after Rippetoe told Feely to back up he told me to unhook the hook off the end of the separator tongue." Witness unhooked it just as Feely backed up. At that time the separator was set. After the chain was unhooked from the separator, Rippetoe was standing about four feet in front of the left-hand wheels—

probably about two feet. "I was standing behind the binder probably about thirteen feet—no obstruction between me and plaintiff so I could see everything he did. Just as I unhooked the hook off the separator pole, Rippetoe raised his left hand and said 'All right; go ahead.' He was talking to Feely, who at that time was on the ground, but just as he gave the signal, he jumped up on the foot-board of the engine and started the engine in motion. Just after he gave the signal to Feely to start, Rippetoe went to the tool-box and got out the level. As soon as he gave Feely the signal, he started for the level— stooped down and got the level out of the tool-box.

"Q. The separator was not moved? A. No, sir.

"Q. What was the position of the chain at that time? What condition was it in? · A. I unhooked it just before he started.

"Q. You unhooked it from the separator pole? A. Yes, off the end of the pole. Just as he started I went up to the chain to see the thing didn't get hooked on the end of the tender reach with the clevis on the end of the tender reach, and I never got there in time before Charlie—I got there quick as I could but I didn't get there in time before Charlie started the engine up.

"Q. State what the hook did. A. Just about the time I got there the hook hooked into the end of the tender reach— that clevis on the tender reach. I had been doing the job of unhooking the chain from the tender reach. Was so instructed by Feely. I started just as soon as I got the hook off the pulley and just about that time Charlie started the engine. Rippetoe had given him the signal. Rippetoe could have seen when he gave the signal that the chain was still in the clevis. He knew it was there—saw it. The chain had not been pulled loose from the tender. It was still dragging through the tender hook when he gave the signal to go ahead but it was as soon as Charlie started. Of course, it did not drag until the machine started. I had given the signal before. The chain made a noise—it rattled some, grinding over that clevis on the end of the tender reach—pretty heavy chain— it must have been a quarter of an inch. When Rippetoe gave

the signal for Feely to start off, he did not have the level in his hand. I never gave the signal to Feely, 'All right, go ahead.' Never said, 'All right.' ''

The defendant testifies that it was the duty of the plaintiff to level up the separator when they moved in. "I had the engine and boiler. He was to give me signals when I was to go forward, back up or stop. When he wanted it started, moved up, he gave me a signal to go ahead,—raised his hands. Sometimes he said, 'Go ahead.' The same way when we moved. When stopped, had his hand raised and let it drop. Never known to give any whistle when we moved or anything like that. I was not to give any whistle back like that when moving or starting to go—pulling, in the field. He asked me once or twice, I believe, shortly after we started out, when belted up and ready to start threshing machine, and I tried every time but might have neglected it two or three times.''

At the time of the accident he says: "He says, 'Go ahead' and threw up his hands to go ahead and I got on the engine and I looked back and he was standing there and throwed his hand up and says, 'Go ahead,' so I started ahead. I went, I judge, ten or twelve feet, maybe fourteen, probably ten or twelve and felt the jerk and looked back—glanced over my shoulder and saw it started to come and then I heard somebody hollow. I was not thinking of anybody being hurt; I thought this separator was being pulled forward out of position, but I knew that the chain had caught in the 'D.' Someone says, 'The separator is on, John,' and I reversed the engine and backed up. Before he gave the signal the separator was brought up in its proper place where the separator was to be. When Rippetoe gave the signal he was standing about four or five or six feet in front of the wheel on the south side. We were heading west in front of it and a foot or two or so out. He was standing facing the north. I was on the ground and as quick as he gave the signal I jumped on the foot-board of the engine. The signal he gave was, 'All right, go ahead,' and I jumped up on the engine and he looked up at me, then he says, 'Go ahead,' and I started the engine up. He signaled twice to go ahead before the engine started.

Mr. Rippetoe did not tell me to move the separator up a foot and a half or two feet further. He gave me no instructions to that effect. I never had any conversation with him about sounding the whistle in the field or on the road or anything like that, but when we threshed. Never told him I would be careful not to hurt him but 'to hell with the balance of them.' I understood that I was to obey his signals and always did. I expect a few times I neglected to whistle when I started up the threshing machine into operation when ready to thresh in the field—neglected that a few times. He did not tell me to sound the whistle or I would kill somebody. Never heard him say that. When moving the engine or starting it you hear the exhaust. It depends on how much steam you turn on as to the exhaust, and then you hear the cylinder drum. As soon as the flywheel gets in good motion, then you put the friction on. You ought to hear the noise 150 feet. I did not see Mr. Rippetoe sitting on the ground kicking the bundles. He was standing out about four or five feet or six feet in front of the wheel, I judge, about two feet or two and a half feet to the south side. I did not see him after I turned around to start the engine. I never heard Mitchell give the signal, 'All right, go ahead.' I didn't think there was any danger that the hook would catch in the clevis—never thought of such a thing. Nothing to indicate it as far as I knew—I understood that he was there. That is what we had him for,—to see that everything was clear. I thought everything was clear when I gave him the signal to go ahead. The whistles are given for the purpose of warning people—each fellow to get to his place and get to work. Rippetoe never told me that if I didn't obey the signals somebody was liable to get killed. When Rippetoe gave the signal to move forward, I could see him. He didn't have anything in his hands. At the time he was taken out from under the machine, he was gripping the level in his left hand.''

There is not much conflict in the evidence in this case upon the material questions involved. The evidence is very voluminous, however, and it is somewhat difficult to segregate the particular points really and necessarily involved in the case

out of the record and determine the necessary and material parts of the evidence upon which there is no conflict whatever. We have, therefore, selected such parts of the evidence relating to the conduct of the plaintiff and the defendant at the time the accident occurred in order to show just what each party did and determine what care each exercised in his conduct at the time the accident occurred. We think it may be conceded in this case, and the evidence seems to prove, a state of facts from which one might conclude that the defendant Feely was guilty of negligence in not blowing the whistle of the engine before he moved up the engine. Still, such negligence would not have resulted in an injury to the plaintiff had not the plaintiff sat down in front of the wheel of the separator and placed himself in a dangerous position where he might be injured and where the separator would necessarily pass over him if moved, unless he could in some way remove himself from such position and avoid any danger; and that he did all this after he had given the signal and spoken in words commanding that the defendant move up so as to move the separator a foot or more. It clearly appears that plaintiff could have removed the bundles of grain in front of the separator in a standing position and by using a fork, and that such method was the proper and usual one employed in such cases, and if plaintiff had adopted such method there would have been no danger and the plaintiff could easily have escaped from the movements of the separator.

The plaintiff was an experienced man with a threshing outfit. He knew if the engine moved forward, fastened to the separator, it would move the separator forward also. He also knew that if the engine was unhooked from the separator and moved forward the hook on the end of the chain could catch in the clevis on the water-tank through which it would pass and if it did so, it would move the separator and he might be run over and hurt. Yet knowing all these facts, about which the evidence is not in conflict, he placed himself in a place of danger. There can be no doubt whatever that had the plaintiff exercised ordinary care, he could have avoided the injury as well as avoided any consequences to himself of the

negligence of the defendant. The plaintiff was the director of the acts of the defendant as engineer at the time the accident occurred. He had the power and the control of the signals to be given. That plaintiff gave a signal to the defendant to go ahead and move up before he placed himself on the ground in front of the separator-wheel, there is no conflict whatever in the evidence. Whether this signal was given before or after Mitchell released or unhooked the chain from the end of the separator tongue, can make no difference, for in either instance he would not be relieved of the ordinary care required of him thereafter in placing himself in a position where he might be injured by a movement of the separator which would result from the defendant's moving the engine forward as directed by the plaintiff, and drawing the chain through the clevis on the tender up to the hook where it might be caught, and thus so fasten the engine on to the separator as to move the separator forward when the engine moved. He could not help knowing that this might happen. His experience in connection with the threshing outfit certainly must have informed him of the possibility of such a thing happening. The plaintiff knew very well when he gave the signal to defendant to go ahead and move up that if the defendant moved the engine the distance necessary for it to move in order to be at a sufficient distance from the separator for the belt to be put in place to operate the separator, that the chain would have to be drawn through the clevis on the tender and the engine would have to be removed further from the separator than the end of the chain would permit if it were fastened; and his signal and command to the defendant was attempted to be carried out by the defendant when he moved the engine forward and the separator was moved by reason of the fact that the hook on the end of the chain caught in the clevis on the tender and the movement of the engine thereby moved the separator. And this was a matter that the plaintiff well knew might happen, and his information and experience gave him better knowledge that it might so happen than that of the defendant, and the degree of care required of him was really greater than the degree of care required

of the defendant, and his failure to exercise such ordinary care as should have been exercised by a prudent man under such circumstances was certainly a proximate cause which led to such injury.

It is a general rule of law, and has been followed in this state, that in an action to recover damages for personal injuries where contributory negligence is plead as a defense, the plaintiff cannot recover when it is proven by the evidence that the negligence of the plaintiff was a proximate cause of the injury, notwithstanding the fact that the evidence may also show negligence on the part of the defendant. (*Pilmer v. Boise Traction Co.,* 14 Ida. 327, 125 Am. St. 161, 94 Pac. 432, 15 L. R. A., N. S., 254; *Wheeler v. O. R. R. Co.,* 16 Ida. 375, 102 Pac. 347; *Goure v. Storey,* 17 Ida. 352, 105 Pac. 794; 29 Cyc., p. 505; *Gilbert v. Burlington C. R. & I. Ry. Co.,* 128 Fed. 529, 63 C. C. A. 27.)

The rule above in a broader sense means that to prevent a recovery by reason of contributory negligence the person injured must have been guilty of a want of ordinary care and that such want of care was a proximate cause of the injury. The negligence or want of care, however, of the injured person need not be the sole proximate cause, for that would exclude all negligence on the part of the defendant, and there would be no room for the application of the rule of contributory negligence on the part of both parties. (1 Thompson on Negligence, secs. 216, 217; *Smith v. O. & O. S. Co.,* 99 Cal. 462, 34 Pac. 84.)

If, then, the plaintiff contributes to the injury which he received at the hands of the defendant by his own want of ordinary care in placing himself in a dangerous place where he might be injured, and did not exercise ordinary care in preventing the accident after he had so placed himself in such position, then the mere fact that the defendant was negligent in not blowing a whistle would not relieve the plaintiff from the effect of his contributory negligence, unless it also appears that the defendant after discovering plaintiff's dangerous position could have avoided the consequences of the plaintiff's negligence; that is, could have avoided the injury which took

place, by the exercise of ordinary care. (*Pilmer v. Boise Traction Co.,* 14 Ida. 327, 125 Am. St. 161, 94 Pac. 432, 15 L. R. A., N. S., 254; *Wheeler v. O. R. R. Co.,* 16 Ida. 375, 102 Pac. 347; Thompson on Negligence, sec. 237.) In this case, if the plaintiff was negligent and did not exercise ordinary care in placing himself in front of the wheel of the separator and did not exercise ordinary care in escaping from the probable effects of the separator passing over him, after he discovered that it was moving, the mere fact that the defendant was negligent in not whistling when he started up would not relieve the plaintiff from the effects of his negligence, unless the defendant discovered the negligence of the plaintiff and the dangerous position in which he was and could have avoided the consequences of such negligence by the exercise of ordinary care on his part.

If there was a risk of danger in the plaintiff taking the position he did in front of the separator, after he had given a signal to move forward, he assumed whatever risk there was because he knew all about the separator, how it was moved, and when moved by the engine attached thereto. He also had complete control of the orders and directions to be given to the engineer. He knew what might happen if the separator did move as he had directed. He also knew that when he sat upon the ground it would be more difficult for him to get away from the separator in passing over him than if he were standing up removing the bundles and in a position whereby he could more easily move himself away from the likelihood of the separator passing over him. So under all the facts of this case, whatever risk there was about the position the plaintiff took in front of the separator or the wheel of the separator, he well knew and assumed such risk, and is responsible for the results of his action.

It is a rule of law that if the evidence is of such a character and degree as to lead different minds to different conclusions as to whether there was negligence, then the question is one of fact to be determined by the jury; but if the evidence is such that but one conclusion can be reached, then the question becomes one of law, and must be determined by the court.

(*Wheeler v. O. R. R. Co.*, 16 Ida. 375, 102 Pac. 347; *Goure v. Storey*, 17 Ida. 352, 105 Pac. 794; *Silcock v. Rio Grande W. Ry. Co.*, 22 Utah, 179, 61 Pac. 565; *Smith v. O. & O. S. Co.*, 99 Cal. 462, 34 Pac. 84.)

It is just as strong a duty of the appellate court to set aside the verdict of a jury where there is no evidence to sustain it or where it is against the law given to the jury by the court, as it is to affirm the verdict of the jury where there is a substantial conflict in the evidence. Looking at the evidence in this case with these principles clearly in mind and as a guide, we are satisfied that but one conclusion can be deduced from such evidence, and that is that the negligence of the plaintiff was a proximate cause of his injury and that the injury to himself would not have occurred had he exercised ordinary care.

For these reasons we think the judgment should be *reversed* and a new trial granted. Costs awarded to appellant.

Ailshie and Sullivan, JJ., concur.